# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TERRENCE THOMAS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 06-10727** |
| **BURL CAIN, WARDEN** | **SECTION "R"(6)** |

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. For the reasons set forth below, it is recommended that the instant petition be **DENIED.**

# I. PROCEDURAL HISTORY

Petitioner, Terrance Thomas, is a prisoner presently incarcerated in the Louisiana State Penitentiary, located in Angola, Louisiana. On August 6, 1998, co-defendants, Terrance Thomas and Demetricy Moore, were indicted for second degree murder. Both defendants pled not guilty. On January 19, 2000, following a two-day jury trial, both defendants were found guilty as charged. On January 28, 2000, both defendants were sentenced to life imprisonment without benefit of parole. On May 29, 2002, the Louisiana Fourth Circuit Court of Appeal affirmed the defendants' convictions and sentences. *State v. Thomas*, No. 2000-KA-1240 (La. App. 4 Cir., May 29, 2002) (unpublished opinion), 825 So.2d 603 (Table). On June 20, 2003, the Louisiana Supreme Court denied petitioner, Terrance Thomas' writ application, thereby rendering his conviction and sentence final. *State v. Thomas*, 847 So.2d 1220 (La. 2003).

Following the completion of his direct appeal proceedings, petitioner sought post-conviction relief. Petitioner's efforts in this regard culminated on November 9, 2006, when the Louisiana Supreme Court denied his writ application. *State ex rel. Thomas v. State*, 941 So.2d 38 (La. 2006).

In the instant petition for federal habeas corpus relief, petitioner claims: 1) The indictment which formed the basis of his criminal conviction was returned by an

unconstitutionally empaneled grand jury; 2) the evidence was insufficient to support his conviction; 3) the state district court erred in failing to grant his "motion for arrest in judgment"; 4) the state district court provided an erroneous jury instruction; and, 5) he was denied effective assistance of counsel at trial and on appeal. However, this court previously recommended that Thomas' petition be dismissed without prejudice for failure to exhaust claims 4 and 5. (See Rec. Doc. 17). Petitioner Thomas then filed a request that his claims, numbered 4 and 5, be dismissed and that his remaining claims be adjudicated. The U.S. Chief District Judge, the Honorable Sarah Vance, adopted the undersigned Magistrate Judge's Report and Recommendation on October 23, 2009 (Rec. Doc. 19) but remanded the matter to the undersigned for consideration of the exhausted claims, numbered 1-3. The State previously conceded that the instant action is timely and neither the State nor petitioner have filed any supplemental pleadings although given the time within which to do so. Therefore, the court proceeds to address claims 1-3 of petitioner's habeas application.

## II. BACKGROUND FACTS

The following is the Statement of the Facts as reported by the Louisiana Fourth Circuit Court of Appeals on the petitioner and his co-defendant's direct appeal of their convictions and sentences[1]:

On the night of May 12, 1998, Tara Willis; her sister, Carla Willis; and her god-sister, LaShonda Laman (collectively referred to as the "Trio"), went to Ms. Moore's house to play cards. While they were playing cards, Mr. Thomas, a friend of Ms. Moore's, came by to borrow some money. Shortly thereafter, a neighbor knocked on the door and announced that Charles Gladstone was outside and that he wanted to speak with Tara Willis. At that time, Tara Willis was several months pregnant, purportedly with Mr. Gladstone's child.

According to Tara Willis, she went outside and had a five to ten minute conversation with Mr. Gladstone. The topic of their conversation was her upcoming baby shower that she was planning and that Mr. Gladstone had promised to help fund. Although Mr. Gladstone had promised her some time ago to get a house with her, he was still residing with Yvette, a woman with whom he had another child. Yvette's house, where he was residing, was located only two blocks away from Ms. Moore's house and on the same street. Tara Willis further

---

[1]The Statement of the Facts is adopted from the Louisiana Fourth Circuit Court of Appeal's decision on petitioners' direct appeal of his conviction and sentence. *See State of Louisiana v. Terrance Thomas and Demetricy Moore*, 2000-KA-1240 (La. App. 4 Cir., May 29, 2002); 825 So.2d 603 (Table).

testified that Yvette knew about Mr. Gladstone's relationship with her and knew of his plans to move out.

While Tara Willis was outside, Ms. Moore mentioned to Mr. Thomas that he should go outside and finish his business with Mr. Gladstone. Particularly, Carla Willis testified that when her sister went outside to converse with Mr. Gladstone, she heard Ms. Moore tell Mr. Thomas the following: "Charles [Gladstone] outside, come handle your business." Ms. Laman likewise testified that while they were at Ms. Moore's house playing cards, she heard Ms. Moore repeatedly tell Mr. Thomas the following: "When you going to handle your business."

After completing her conversation with Mr. Gladstone, Tara Willis returned inside to complete the card game. Ms. Moore, however, declined to complete the game; instead, Ms. Moore insisted that she was going down the street to talk to Yvette. Ms. Moore stated that she planned to tell Yvette about Tara Willis' relationship with Mr. Gladstone and about her pregnancy.

At that point, Ms. Moore and Mr. Thomas abruptly departed in Mr. Thomas' car without locking Ms. Moore's house. Carla Willis testified that as Ms. Moore and Mr. Thomas departed from Ms. Moore's house, she and Ms. Laman attempted to follow them and get into Mr. Thomas' car, but Tara Willis told them not to do so. Carla Willis still further testified that Tara Willis then locked the doors to Ms. Moore's house, and the Trio departed in Tara Willis' car  to Yvette's house. Tara Willis drove, Ms. Laman sat in the front

passenger seat, and Carla Willis sat in the back. According to Tara Willis, the purpose for which she went to Yvette's house was to give Ms. Moore her house keys.

According to Tara Willis, when she arrived she spotted Ms. Moore on the porch knocking at Yvette's door.(footnote omitted) She saw Mr. Gladstone open the door, then she heard him state: "Girl don't come here with this foolishness," and then she saw him slam the door shut. Ms. Moore then knocked on the door again, and Mr. Gladstone came outside. An oral altercation ensued between Mr. Gladstone and Ms. Moore. Eventually, Ms. Moore walked from the porch to Mr. Thomas' car; Mr. Gladstone followed. Ms. Moore got back into the car. Although she and Mr. Thomas drove off a short distance, they immediately backed up apparently because Mr. Gladstone was arguing with Tara Willis.

Once Mr. Thomas' car stopped, Mr. Gladstone resumed arguing with Ms. Moore. According to Tara Willis, she then returned to her car, which was parked ahead of Mr. Thomas' car. Tara Willis testified that she could see from her rear view mirror that Mr. Gladstone was leaning into the passenger side of Mr. Thomas' car. She further testified that she heard Mr. Gladstone loudly state: "Now you going to pull a gun on me." Tara Willis then heard a single shot and saw Mr. Gladstone fall straight down on his face in the street. Immediately after, she saw Mr. Thomas' car in which Mr. Thomas was driving and Ms. Moore was a passenger, depart. Tara Willis then jumped out of her car and came to Mr. Gladstone's aid. Although she attempted to revive him, he failed to respond. Tara Willis

testified that she was sure that the shot come from Mr. Thomas' car since no one else was around.

Throughout the entire event, Carla Willis stated that she and Ms. Laman stayed in Tara Willis' car. Carla Willis also stated that when Mr. Thomas' car backed up, the Trio were all in Tara Willis' car, and they were about to depart. Finally, Carla Willis testified that when she looked out the back car window she saw Mr. Gladstone leaning into the passenger side of Mr. Thomas' car where Ms. Moore was seated and heard Mr. Gladstone state: "oh, you going to pull a gun on me now" or "you're going to shoot me."

Ms. Laman testified consistently with Tara and Carla Willis. Ms. Laman testified that they were in Tara Willis' car moments before Mr. Gladstone was shot, that she saw him leaning into the passenger side of Mr. Thomas' car, and that she heard him loud and clearly state: "You going to pull a gun on me." Ms. Laman further testified that she was looking at him when he made that statement. She, however, indicated that she could not see into the vehicle as it was dark and the car windows were tinted.

Dr. Paul McGarry, a forensic pathologist with the Orleans Parish Coroner's office, performed the autopsy. Dr. McGarry testified that Mr. Gladstone died from a single gunshot wound that entered the front of his neck above his collarbone. The bullet traveled almost in a straight line down his body into his chest and hit the aorta, which caused a large amount of blood to enter the left lung. Mr. Gladstone died due to a massive internal hemorrhage caused by the hole in his aorta. Dr. McGarry also testified that strippling [sic: stippling] was

found around the entry wound. Explaining the meaning and significance of this finding, Dr. McGarry testified that strippling [sic] refers to tiny particles of gunpowder that hit the skin and can be found around an entry wound and that this generally occurs when a gun is fired from a close distance ranging from twelve to eighteen inches.

As noted, immediately after the shot was fired, both Ms. Moore and Mr. Thomas fled the scene in Mr. Thomas' car. The Trio remained on the scene and positively identified Ms. Moore (based on their long-term personal acquaintance with her) and Mr. Thomas (based on photographic line-ups). About a month after the shooting, the police received an anonymous call reporting the whereabouts of Ms. Moore and Mr. Thomas at a local motel. Based on that call, the police located and arrested them. The police never found the murder weapon or any other gun.

At the joint trial, the state's case was based on the testimony of the Trio and the pathologist who performed the autopsy. In defense, both Ms. Moore and Mr. Thomas testified on their own behalf.

Ms. Moore testified that after Tara Willis' initial conversation with Mr. Gladstone outside her house, she and Tara Willis jointly decided to go talk to Yvette. According to Ms. Moore, they decided to tell Yvette about Mr. Gladstone's relationship with Tara Willis and her pregnancy with his child. Ms. Moore further testified that since she was unsure of the exact location of Yvette's house, she had Tara Willis identify the correct door and then wait on the porch steps. Ms. Moore testified that, after Mr. Gladstone opened the door, she told

him that she wanted to talk to Yvette and that he responded by starting an argument with her. She further testified that they continued arguing even as she was returning to Mr. Thomas' car and even as she and Mr. Thomas were driving away.

As they were driving away, Ms. Moore testified that she observed that Mr. Gladstone had started an argument with Tara Willis. Concerned about Tara Willis' safety, Ms. Moore instructed Mr. Thomas to back the car up. Ms. Moore testified that at that point Mr. Gladstone resumed arguing with her and that he was standing by Mr. Thomas' car about the halfway point. Ms. Moore testified that she became frustrated with the argument, lowered her head, and then heard a gunshot. She further testified that she did not know where the gunshot came from. She still further testified that Mr. Gladstone was not leaning on Mr. Thomas' car at that time and that she saw him grab himself, fall back, and then she and Mr. Thomas departed.

Mr. Thomas testified that when he drove Ms. Moore to Yvette's house, he pulled up at the same time as Tara Willis did, and Ms. Moore and Tara Willis then went to the door. Originally, the argument was only between Ms. Moore and Mr. Gladstone. After Mr. Gladstone came out, Tara Willis walked back to the car and she handed Mr. Thomas the keys to Ms. Moore's house. Although Ms. Moore and Mr. Gladstone were arguing loudly, Mr. Thomas stated that he was not paying attention to what they were arguing about; instead he was playing CDs on his car stereo. However, Mr. Thomas testified that when Mr. Gladstone came close to his car, he heard him state he was going to get Yvette to "whip both you all

[Tara Willis and Ms. Moore]." Mr. Thomas further testified that as they initially pulled off, Ms. Moore said "hold up, she [Tara Willis] ain't in her car yet" and that he then backed up the car. He indicated that he backed up slowly because he was too close to Tara Willis' car and that Tara Willis and Mr. Gladstone were behind him. He still further stated that Mr. Gladstone and Ms. Moore resumed arguing, and he lowered his radio.

At that time, Mr. Thomas described Mr. Gladstone's position as standing by "where his little window was." Mr. Thomas further explained that a little later he heard a shot and drove off. At the time he heard the shot, Mr. Thomas stated he was looking in a CD case that he had on his lap. Mr. Thomas further stated that as he dove off he saw Tara Willis standing behind his car by the hood. He further stated that when he looked in his rear view mirror he saw Mr. Gladstone standing in the street and that he never saw him on the ground. Mr. Thomas indicated that he was unaware of whether Mr. Gladstone had been shot and that the reason he drove off was because he believed someone was shooting.

After the shooting, Mr. Thomas testified that he and Ms. Moore drove around for a while and then stopped at Schwegmann's to get something to eat. Since Ms. Moore did not want to go home because she was scared, he testified that they went to a motel instead. Mr. Thomas also testified that he had a prior altercation with Mr. Gladstone regarding him engaging in horseplay with Tara Willis while unbeknownst to him she was pregnant. Apparently, Mr. Gladstone came to Ms. Moore's house on a prior occasion to discuss this matter with Mr. Thomas. On that occasion, Mr. Gladstone told Mr. Thomas that he carried

a gun and that he "ain't afraid to use it." Mr. Thomas testified that he told Mr. Gladstone that: "You didn't bring a gun into this, house" and that he was upset about this incident. Mr. Thomas, however, indicated that the incident ended amicably.

At trial, Mr. Thomas acknowledged he had a history of several prior convictions; namely, three felonies—possession of cocaine, distribution of drugs, and possession of a stolen automobile—and two misdemeanors—unauthorized use and battery on a police officer.[2]

## III. STANDARD OF REVIEW

The court's review of Thomas' petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, which mandates that federal courts give great deference, subject to limited exceptions, to the state courts' resolution of a petitioner's claims. *Holland v. Anderson,* 583 F.3d 267, 271 (5th Cir. 2009), citing *Foster v. Quarterman*, 466 F.3d 359, 365 (5th Cir.2006). This "deference is mandated both for questions of law and for mixed questions of law and fact." *Id.* Under AEDPA, a federal court cannot grant habeas relief unless the state court adjudication of a claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable

---

[2]*State of Louisiana v. Terrance Thomas and Demetricy Moore*, Writ No. 2000-KA-1240, 825 So.2d 603 (La. 4th Cir.5/29/2002).

determination of the facts in light of the evidence presented in the State court proceeding. *Id.* at 272, citing 28 U.S.C. § 2254(d); *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "Under § 2254(d)(1), a decision is contrary to clearly established federal law if 'the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law' or 'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that precedent].' " *Oliver v. Quarterman*, 541 F.3d 329, 334 (5th Cir.2008), *cert. denied*, --- U.S. ----, 129 S.Ct. 1985, 173 L.Ed.2d 1084 (2009), (quoting *(Terry) Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)) (alterations in original). "A decision involves an unreasonable application of Supreme Court precedent if it 'unreasonably extends a legal principle from [Supreme Court precedent] to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.' " *Id.* (*quoting Williams*, 529 U.S. at 407, 120 S.Ct. 1495) (alteration in original). This court must presume that the state court's factual findings are correct unless Thomas meets his " 'burden of rebutting [that] presumption ... by clear and convincing evidence.' " *Foster*, 466 F.3d at 365 (quoting 28 U.S.C. § 2254(e)(1)) (alteration and omission in original).

## IV. ANALYSIS

> **Claim 1: Whether the state trial court exceeded its jurisdiction since the indictment which formed the basis of Thomas' criminal conviction was returned by an unconstitutionally impaneled grand jury**

Petitioner claims that the state trial court exceeded its jurisdiction since his indictment resulted from an allegedly unconstitutionally impaneled grand jury, in violation of the Fourteenth Amendment and pursuant to the case of *State v. DiLosa*, 848 So.2d 546 (La. 2003). The same argument was raised by petitioner's co-defendant, Demetricy Moore, in her federal habeas, which was earlier decided by the undersigned Magistrate Judge. The claim was rejected and the Report and Recommendation was adopted by U.S. District Judge, the Honorable Kurt Engelhardt on March 17, 2010. *See Moore v. Jones*, 2010 WL 1170116 (E.D. La. 2010).

In *Dilosa*, *supra*, the Louisiana Supreme Court determined that La. C. Cr. P. art. 413(C), which set forth the process for selection of grand juries in Orleans Parish at the time an Orleans Parish grand jury indicted petitioner, failed to provide the procedural protections required by the Louisiana Constitution. *Id*. at 546. Federal habeas corpus relief, however, may be granted only when a petitioner has suffered a violation of his or her rights under the United States Constitution. 28 U.S.C. § 2254; *Engle v. Isaac*, 456 U.S. 107, 119 (1982). Because the constitutional rights addressed in *Dilosa* were state constitutional rights, federal habeas corpus relief is not available to petitioner. *Davis v. Jones*, 2006 WL 1540114 at *2 n.11 (E.D. La. 2006). "The fact that those provisions [referring to La. Code Crim. P. art. 413(B)] violated the state constitution is of no moment in a federal proceeding." *Morrison v. Cain*, 2007 WL 4114345 (E.D. La. 2007), (Feldman, J.)(adopting Report and Recommendation of Magistrate Judge Wilkinson, Jr.)(citations omitted). Moreover, as

Magistrate Judge Chasez explained in her Report and Recommendation issued in *Varnado v. Cain*, Civil Action 02-1286 c/w 03-753 and 03-754, 2004 WL 2984804 (E.D. La. 2004), "*Dilosa* affords [petitioner] no solace because it is axiomatic that federal habeas relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice."   Petitioner's challenge to the grand jury based upon *State v. DiLosa*, 848 So.2d 546, therefore, should be denied.

**Claim 2: Whether petitioner was denied due process as a result of being convicted based upon insufficient evidence**

Petitioner complains that the evidence produced by the State did not meet the constitutional requirements of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Specifically, petitioner asserts that "there was 'no' direct evidence or witness testimony presented by the State that showed that the petitioner shot or knew that the victim would be harmed ..."[3]  Petitioner thus contends that the state failed to show the requisite intent to convict him of second degree murder. [4]

The Supreme Court established the due process standard a reviewing court must utilize in analyzing the sufficiency of the evidence in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  Pursuant to *Jackson*, the inquiry is whether, viewing the

---

[3]Rec. Doc. 3 at p. 16.

[4]Petitioner acknowledges that he and co-defendant Moore were convicted as principals but complains that, as a principal, his individual specific intent to kill or inflict great bodily harm was not established. Rec. Doc. 3 at p. 17.

evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime, as identified by state substantive law, to have been proven beyond a reasonable doubt. *Id.* at 316-17, 99 S.Ct. at 2787. In a federal habeas corpus proceeding, great deference must be given to the factual findings in the state court proceedings such that the reviewing court must defer to the jury's resolution of credibility determinations and the justifiable inferences of fact that can be drawn from these determinations. *Knox v. Butler*, 884 F.2d 849, 851 (5th Cir. 1989). Further, the habeas corpus statute obliges federal judges to respect credibility determinations made by the trier of fact. *Pemberton v. Collins*, 991 F.2d 1218, 1225 (5th Cir. 1993), *cert. denied*, 114 S.Ct. 637, 126 L.Ed.2d 596 (1993), citing *Summer v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982).

The state appellate court addressed in detail Thomas' insufficiency of the evidence claim on direct appeal in *State of Louisiana v. Terrance Thomas and Demetricy Moore*, 825 So.2d 603 (La. 4th Cir. 5/29/2002)(unpublished),[5] as follows:

> Ms. Moore and Mr. Thomas contend that the evidence was constitutionally insufficient to support their convictions. The convictions at issue are for second degree murder, which is defined as the killing of a human being with the specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1. The specific intent to kill is an ultimate legal conclusion that a fact-finder can infer from the pointing of a gun at close range and pulling of the trigger. *State v. Williams,* 383 So.2d 369, 373 (La. 1980). That fact is present, but only can be attributed to one of the two alleged offenders. The dispositive question is

---

[5]A copy of this decision is located in State Rec. Vol. 3.

whether both Mr. Thomas and Ms. Moore were properly convicted of second degree murder as principals pursuant to La. R.S. 14:24, which defines as a principal all persons "concerned in the commission of the crime."

Given the state's inability to establish that either of them fired the shot, Ms. Moore and Mr. Thomas argue that the state cannot establish either of them were principals. They further argue that to establish their status as principals the state was required to prove that each of them had the specific intent to kill or to inflict great bodily harm and that the evidence was insufficient to satisfy that burden of proof. In this regard, they cite *State v. Holmes,* 388 So.2d 722 (La. 1980), for the proposition that "an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state" and that "[m]ere presence at the scene" is insufficient to "concern" an individual in the crime.

In reviewing sufficiency of the evidence to support a conviction, this court applies the due process standard enunciated in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under the *Jackson* standard, an appellate court must determine that the evidence, viewed in the light most favorable to the state, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proved beyond a reasonable doubt. The *Jackson* standard "preserves the role of the jury as the fact finder in the case but it does not allow jurors 'to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.'" *State v. Pierre,* 93-0893, p.5 (La. 2/3/94), 631 So.2d 427, 429.

Under the *Jackson* standard, all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. *State v. Jacobs,* 504 So.2d 817, 820 (La. 1987). When circumstantial evidence forms the basis for the conviction, the totality of such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. However, the circumstantial evidence rule is not a separate test from the *Jackson* standard; La. R.S. 15:438 is simply "an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found defendant guilty beyond a reasonable doubt." *State v. Wright,* 445 So. 2d 1198, 1201 (La. 1984).

Applying the above guidelines to this case in which the state's proof hinged almost entirely upon circumstantial evidence and viewing the evidence in the

light most favorable to the state, we now address Ms. Moore's and Mr. Thomas' argument that the state failed to exclude a reasonable hypothesis of innocence; namely, that one of them was the sole shooter and the other was merely present and neither aided or abetted the other in the commission of the crime. Stated otherwise, they argue that the evidence viewed most favorable to the state is that "the shot that killed the victim was fired from the appellants' [Mr. Thomas'] vehicle," and that "one of the appellants was merely present when the other unexpectedly shot a weapon that ultimately killed the victim."

The general rule is that "'liability [as a principal] will not flow merely from a failure to intervene;' however, 'silence in the face of a friend's crime will sometimes suffice when *immediate proximity* of the bystander is such that he could be expected to voice some opposition or surprise if he were not a party to the crime.'" *State v. Bridgewater,* 2000-1529 at pp. 11-12 (La. 1/15/02), ___ So. 2d ___, ___ (quoting 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law,* § 6.7(a) (1986) (Emphasis supplied)). Such is the case here.

In this case, the circumstantial evidence that the state relied on to establish joint liability as principals in this case included the following: (1) the Trio's[6] testimony that the shot had to come from Mr. Thomas' car because no one else was in the area; (2) the Trio's testimony that Mr. Gladstone was leaning up against the passenger side of Mr. Thomas' car and loudly stated just moments before the firing of the shot that a gun was being pointed at him; (3) the pathologist's testimony based on the autopsy that the shot was fired at close range from directly in front and at an angle consistent with Mr. Gladstone leaning up against a vehicle; and (4) the departure from the scene of both Mr. Thomas and Ms. Moore in Mr. Thomas' car immediately following the firing of the shot.

The evidence, albeit circumstantial, does not support the characterization of either of the appellants, Ms. Moore or Mr. Thomas, as "merely present" as the jurisprudence has construed that phrase in this content. Significantly, they were sitting next to each other in the front seat of the same car from which the shot emanated; hence, this case is distinguishable from cases in which the

---

[6]The court was referring to Carla and Tara Willis and LaShonda Lama, collectively, as the "Trio".

alleged principal was in another room of the house when the crime was committed. *See Bridgewater, supra.* Given their *"immediate proximity"* to each other, the one that allegedly was not involved would "'be expected to voice some opposition or surprise if he were not a party to the crime.'" *Bridgewater, supra.*

In *State v. Meyers,* 95-750 (La. App. 5 Cir. 11/26/96), 683 So.2d 1378, which involved a drive-by shooting, both the driver and a passenger were convicted as principals of second degree murder. On appeal, the defendants argued that they lacked the specific intent to kill. Affirming their convictions, the court of appeal reasoned that "neither [the driver] nor [the passenger] tried to assist the victim. . . after the shooting. They did not call the police to report the shooting or give any statement regarding the murder to anyone. [The driver] drove the Cutlass to the scene and [the passenger] watched the incident thru the car window." *Meyers,* 95-750, p. 11, 683 So.2d at 1384. The court of appeal acknowledged the lack of direct evidence that either the driver or the passenger knew the perpetrator was armed, yet reasoned that they "were definitely not an innocent driver and passenger in the car." *Id.; see also State v. Hayes,* 2001-736, pp. 13-14 (La. App. 5 Cir 12/26/01), 806 So.2d 816, 824 (following *Meyers*).

Reliance on a defendant's failure to act is supported by the Legislature's express inclusion of such inaction within the definition of specific intent in La. R.S. 14:10(a). Particularly, La. R.S. 14:10(a) defines specific intent as "that state of mind which exists when . . . the offender actively desired the prescribed criminal consequences to follow his act or *failure to act.*" La. R.S. 14:10(a)(Emphasis supplied). In this case neither Ms. Moore nor Mr. Thomas attempted to assist Mr. Gladstone or attempted to report the shooting to the police. Instead, they fled together in Mr. Thomas' vehicle and were arrested together about a month after the crime at a local motel. Taken together with the circumstantial evidence enumerated earlier in this opinion, we conclude that although this is an extremely close case, the evidence was sufficient for a rational juror to have found both Ms. Moore and Mr. Thomas guilty as principals.

*Id.*

This court has reviewed the trial transcripts in this case, and, in particular, the testimony of on-the-scene witnesses, Tara Willis, Carla Willis, LaShonda Laman, as well as the testimony of both of the defendants (Moore and Thomas), and Dr. McGarry, the forensic pathologist who conducted and dictated the autopsy report for the victim, Charles Gladstone. As was emphasized by the state appellate court, the truly damaging testimony from the pathologist that the gunshot wound to the victim was at close range (12-18 inches or 24 inches at most) , occurred at an angle consistent with the eyewitness reports that the victim was leaning into the automobile containing both of the defendants when he was shot, and that the gunshot was not self-inflicted, was obviously strongly persuasive to the jury. [7] Moreover, the defendants' own accounts that they left the scene of the crime rather than reporting what they knew to the police, that they stayed in various locations (the Weber Motel, the Glenrose Hotel and at Demetriecy's home), that Demetricy quit her job immediately after the crime, and that Thomas changed vehicles, apparently influenced the jury and led it to conclude the defendants were "on the run" because they were guilty of second degree murder.[8] Such evidence also apparently convinced the jury that the two defendants each had the specific intent to kill or inflict great bodily harm on the victim and that they acted in concert, ie., as principals to the crime. Petitioner's reliance on the state case of *State v. Bridgewater*, 823

---

[7]See Trial transcript at pp. 58-70.

[8]See Trial transcript at p. 288-289, 329, 344-351 (Demetricy Moore); Trial transcript at p. 406-409 (Terrance Thomas).

So.2d 877 (La. 2002), for the idea that "silence and not voicing opposition or surprise" is insufficient to find co-defendants guilty as principals, is simply an incorrect application of *Bridgewater*. In *Bridgewater*, a case cited in the state appellate opinion affirming Thomas' conviction, the court specifically stated that, "As a general rule, 'liability [as a principal] will not flow merely from a failure to intervene'; however, 'silence in the face of a friend's crime will sometimes suffice when the immediate proximity of the bystander is such that he could be expected to voice some opposition or surprise if he were not a party to the crime.'" *Id.* at 891. While the defendant in *Bridgewater* was *not* in the immediate proximity of the victim when the crime occurred (the only evidence having placed him in the victim's garage while the victims were shot in the master bedroom by the co-defendant), such is not the case here. All eyewitness testimony as well as that of both defendants placed Thomas in close proximity with his co-defendant Moore, when the crime occurred.

Moreover, other evidence that supported the State's conviction included the following: Tara Willis testified that she believed the gunshot came from the car, that she heard the victim, who was leaning into the car containing the defendants, state, "Oh you going to pull a gun on me ..", and that she heard Demetricy Moore tell co-defendant Thomas that she wanted him to "handle his business."[9] LaShonda Laman and Carla Willis testified similarly that they also heard Moore tell Thomas to "handle his business" and that when the

---

[9]Trial transcript at pp. 131-132.

victim was leaning into the defendants' car, he stated that a gun was being pulled on him.[10]
Importantly, none of the witnesses placed any other person other than the defendant and his
co-defendant, Moore, within close enough distance to shoot the victim in the manner and
at the angle described by Dr. McGarry.

Where a state appellate court thoughtfully reviews the issues of sufficiency of the
evidence, that court's determination is entitled to great weight. *Callins v. Collins*, 998 F.2d
269, 276 (5th Cir. 1993); *Porretto v. Stalder*, 834 F.2d 461, 467 (5th Cir. 1987); *Parker v.
Procunier*, 763 F.2d 665, 666 (5th Cir. 1985) (per curiam), *cert. denied*, *Parker v. McCotten*,
474 U.S. 855, 106 S.Ct 159, 88 L.Ed.2d 132 (1985) (quoting *Jackson*, 443 U.S. at 322 n.15,
99 S.Ct. at 2790 n.15). petitioner fails to show that the state court's determination that the
evidence was sufficient in his case was contrary to the requirements of *Jackson v. Virginia*,
supra. This claim should also be denied.

**Claim 3:  Whether the trial court erred in denying petitioner's motion for arrest of
judgment**

Petitioner's third claim has essentially already been addressed and denied in this
Report and Recommendation albeit the claim was phrased differently in the earlier claim
(Claim 1). Here, petitioner argues that the trial judge should have granted his Motion for
Arrest of Judgment which was based on the claim that the grand jury was unconstitutionally
impaneled pursuant to *State v. DiLosa*, 848 So.2d 546 (La. 2003). Petitioner asserts that the

---

[10] Trial transcript at pp. 182, 185, 202, 206, 221- 224, 240.

trial court should have recognized that an illegally impaneled grand jury thus deprived the court of jurisdiction to proceed to trial on his case. For the reasons set forth in this court's determination on Claim 1, just because an indictment did not comply with the state constitutional requirements found violated *in Dilosa* does not mean that federal habeas relief is justified.

"It is settled in this Circuit that the sufficiency of a state indictment is not a matter for federal habeas corpus relief unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction." *Branch v. Estelle*, 631 F.2d 1229, 1233 (5th Cir.1980). *See also Meyer v. Estelle*, 621 F.2d 769, 771 (5th Cir.1980); *Murphy v. Beto*, 416 F.2d 98, 100 (5th Cir.1969). The U.S. Fifth Circuit has observed that habeas corpus can be invoked with respect to the sufficiency of an indictment only when the indictment is so fatally defective that under no circumstances could a valid conviction result from facts provable under the indictment, and that such a determination "can be made only by looking to the law of the state where the indictment was issued." *Johnson v. Estelle*, 704 F.2d 232, 236 (5th Cir.1983) (emphasis added). Specifically, the conclusion as to whether a state trial court was deprived of jurisdiction by a fatally defective indictment is a question foreclosed to a federal habeas court "[w]hen it appears ... that the sufficiency of the indictment was squarely presented to the highest court of the state on appeal, and that court held that the trial court had jurisdiction over the case." *Murphy v. Beto*, 16 F.2d 98, 100 (5th Cir.1969). *See also Bueno v. Beto*, 458 F.2d 457, 459 (5th Cir.), *cert. denied*, 409 U.S. 884, 93 S.Ct. 176, 34

L.Ed.2d 140 (1972); *Lowery v. Estelle*, 696 F.2d 333, 337 (5th Cir.1983) ("... the predicate conclusion of no jurisdiction derives wholly from state law controlling the validity of Texas indictments.")

In this case, petitioner's claim was never reviewed *on the merits* by the highest state court.[11] However, looking at the state jurisprudence addressing the issue of whether a *Dilosa* violation makes an indictment so defective that the trial court was deprived of jurisdiction, this court would have to find that it does not. In *State v. Williams*, 866 So.2d 296 (La. 2004), the Louisiana Court of Appeal, Fourth Circuit considered the effect of an indictment made by an Orleans Parish grand jury impaneled pursuant to the statutes that were declared unconstitutional in *DiLosa*. The *Williams* court determined that "the substantial rights of a criminal defendant are not affected *per se* solely because he is indicted by a grand jury selected pursuant to local laws passed by the Louisiana State legislature." *Id*. at 879. As a result, the court refused to reverse Williams' conviction. Thus, looking to the law of the state where the indictment was issued (as it is explained in *Williams*, supra), this court cannot find that under state law, any flaw in grand jury selection would have deprived the trial court of jurisdiction.

Additionally, as previously stated, the highest state court to review this claim as raised by Terrence Thomas did not address the claim on the merits. Rather the court relied upon

---

[11]As will be explained, petitioner's claim was considered procedurally barred by the state courts.

the ruling of the intermediate appellate court below that Thomas had failed to file a motion to quash the indictment based upon the unconstitutionality of the local laws at issue and thus was procedurally barred from raising his claim.[12]

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the merits of the federal claim and adequate to support that judgment. *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir.), *cert. denied*, 516 U.S. 1005, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995), *citing Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989). This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review. *Amos*, 61 F.3d at 338 (citations omitted). As explained in *Coleman v. Thompson*, 501 U.S. 722, 730-31, 111 S.Ct. 2546, 2554, 115 L.Ed .2d 640 (1991): "In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity.... Without the rule, ... habeas would offer state prisoners whose custody was supported by independent and adequate state grounds ... means to undermine the State's interest in enforcing its laws."

---

[12]See State Court Rec. Vol. 5 for a copy of the 4th Circuit's Decision in *State v. Thomas*, Writ No. 2005-K-1437 (La. Ct. App. 4th Cir, 2/1/2006). In that decision, the state court found that petitioner's challenge to the grand jury selection process was barred for his failure to file a motion to quash the grand jury foreperson selection, citing La. C.Cr. P. art. 531, et seq. and *Deloch v. Whitley*, 684 So.2d 349 (La. 1996). The Louisiana Supreme Court denied relief on review of this decision, apparently based upon the appellate court's finding of a procedural bar.

In order to fulfill the independence requirement of the above-described doctrine, the last state court rendering a judgment in the case must "clearly and expressly" indicate that its judgment is independent of federal law and rests on a state procedural bar. *Amos,* 61 F.3d at 338; *Harris*, 489 U.S. at 263, 109 S.Ct. at 1043. When the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last **reasoned** state court opinion. *Ylst v. Nunnemaker***,** 501 U.S. 797, 802, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991) (emphasis added).

In this case, petitioner's claim was not reviewed on the merits by the state appellate court because of a state procedural bar, i.e., La. C. Cr. P. art. 531[13] and, it can be presumed under *Ylst* that the Louisiana Supreme Court relied upon that last reasoned opinion and also procedurally barred the claim. Therefore, petitioner's claim is procedurally defaulted unless petitioner can show cause and prejudice for his procedural default. "Cause" can be shown by demonstrating that "some objective factor external to the defense impeded counsel's ability to raise the claim in a procedurally proper manner. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). The failure to show 'cause 'is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown." *Hogue v. Johnson*, 131 F.3d 466, 497 (5th Cir. 1997), citing *Engel v. Isaac*, 456 U.S. 107, 134 n. 43 (1982).

---

[13]This procedural article requires the following: "All pleas or defenses raised before trial, other than mental incapacity to proceed, or pleas of 'not guilty' and of 'not guilty by reason of insanity' shall be urged by a motion to quash."

Petitioner makes no showing of "cause or prejudice" for his procedural default of this claim nor does the court's review of the record reveal any reasons why petitioner would have justifiably failed to comply with the state procedural rule and file a motion to quash the grand jury selection. Nor has there been a showing that the state rule is not "adequate" (i.e., unevenly or arbitrarily applied), *see Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997), or that the state rule is not "independent" of federal law (i.e., must rest solely on a state procedural bar.) *See, Amos*, 61 F.3d at 338.[14] The court notes that the State did not raise the procedural bar defense relative to petitioner's third claim. However, a federal court may, in the exercise of its judicial discretion, raise procedural default *sua sponte* in a habeas case, in order to further the interests of comity, federalism and judicial efficiency. *Magouirk v. Phillips*, 144 F.3d 348, 358 (5th Cir. 1998). The primary purpose of requiring the State to raise the defense of procedural default is to provide notice of the defense to the habeas petitioner and thus allow him the opportunity to present any claim of "cause and prejudice" for his default. In this case, petitioner is given time to object to the undersigned's Report and Recommendation and, if there is a basis for a finding of "cause and prejudice", he would be able to present the argument in his objections. However, as previously explained, the state courts have already found that an indictment in violation of *Dilosa* is legally sufficient for the court to have jurisdiction because "the substantial rights of a criminal defendant are not

_____

[14]Thomas' only means of escaping the procedural bar would be to establish that a fundamental miscarriage of justice will occur if the merits of his claims are not reviewed. The record does not support that a fundamental miscarriage of justice will occur in this case.

affected" based upon a failure to comply with the local laws. *Williams*, at 879. Thus, even if petitioner was not procedurally barred from raising his claim, it would still fail on the merits and his claim does not warrant federal habeas relief.

Accordingly, and for all the afore-mentioned reasons;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the petition of Terrence Thomas for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED WITH PREJUDICE.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Ass' n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[15]

New Orleans, Louisiana, this ⎽⎽13th⎽⎽ day of ⎽⎽⎽⎽July⎽⎽⎽⎽⎽⎽, 2010.

LOUIS MOORE, JR.
UNITED STATES MAGISTRATE JUDGE

---

[15]*Douglas* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.